2009 Ark. 434

**Courtney POLLARD, Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CR 08–1294.**

Supreme Court of Arkansas.

Sept. 24, 2009.

Bart Ziegenhorn, West Memphis, for appellant.

Dustin McDaniel, Att'y Gen., by: Brad Newman, Ass't Att'y Gen., for appellee.

ELANA CUNNINGHAM WILLS, Justice.

A Crittenden County jury convicted Courtney Pollard on charges of first-degree murder and criminal use of a prohibited weapon. On appeal, Pollard brings two points for reversal of his conviction. First, he argues that the circuit court erred by refusing to instruct the jury on the charge of manslaughter as a lesser-included offense of first-degree murder. Second, he argues that the circuit court erred by denying his motion for a mistrial

for a violation of Ark. R. Evid. 615. We find no error and affirm.

Pollard does not challenge the sufficiency of the evidence; therefore, it is not necessary to recite the facts in great detail. *See Osburn v. State*, 2009 Ark. 390, 326 S.W.3d 771. By his own admission, Pollard shot and killed Marvin Banks on the night of September 28, 2007. Banks's brother, Carl Banks, testified at trial that he was leaving a house at approximately 10:00 p.m. that night when Pollard pulled in front of the house in a black [2]vehicle, exited the vehicle with a sawed-off shotgun, and asked, "Where's Marvin?" Pollard then returned to the vehicle, and it sped away. Similarly, Eva Moore testified that she witnessed Pollard get out of a vehicle with a sawed-off shotgun after it pulled into her driveway and that Pollard stated that he intended to shoot Banks. Moore stated that the vehicle then drove away and that she later witnessed Banks walking toward Pollard and heard Banks "saying something like 'You want some more?'"

According to eyewitness Ozie Williams, Pollard got out of a vehicle with a gun as Banks approached him on a street. Williams testified that Banks stopped behind a car, took off his white T-shirt, wrapped it around his hand, and told Pollard to put the gun down and "fight me like a man." Williams testified that Pollard then shot Banks as Banks stood still in the middle of the street. Another witness, Stephanie Brown, testified that she heard Pollard and Banks arguing just before Banks raised his hands and Pollard

shot him. No eyewitness testified that Banks was armed with a gun.

Pollard took the stand at trial and testified that he feared Banks because of Banks's violent reputation and because Banks had accused him of being a "snitch." Pollard stated that Banks showed him the butt of a pistol in his waistband and threatened him on the night of the killing. Pollard testified that later the same night, Banks approached him on a street with his fist wrapped in something. Pollard stated that he "believed" that Banks had a gun and that he shot Banks, because he believed Banks intended to kill him.

[3]Gary Banks of the Crittenden County Sheriff's Office testified that he received a phone call from Pollard on the night of September 28, 2007, or the early hours of the 29th, and that Pollard admitted shooting Banks. Pollard later turned himself into the sheriff's office, and officers recovered a shotgun from his vehicle, later identified as the murder weapon.

Pollard first argues that the trial court erred by refusing to instruct the jury on the lesser-included offense of manslaughter. This court will not reverse a trial court's ruling on the submission of a lesser-included jury instruction absent an abuse of discretion. *Jackson v. State*, 375 Ark. 321, 290 S.W.3d 574 (2009). This court will affirm a trial court's decision to not give a lesser-included-offense instruction if there is no rational basis for giving the instruction. *Id.; see also* Ark.Code Ann. § 5–1–110(c).

Pollard proffered the following jury instruction, based on Ark.Code Ann. § 5–10–104(a)(1) (Supp.2007) [1]:

1. Under Ark.Code Ann. § 5–10–104(a)(1), a person commits manslaughter if
    (A) The person causes the death of another person under circumstances that would be murder, except that he or she causes the death under the influence of extreme emo-
tional disturbance for which there is reasonable excuse.
    (B) The reasonableness of the excuse is determined from the viewpoint of a person in the actor's situation under the circumstances as the actor believed them to be.

AMCI 2d 1004

MANSLAUGHTER

Courtney Pollard is charged with the offense of manslaughter. To sustain this charge the State must prove beyond a reasonable doubt that:

(a) Courtney Pollard caused the death of Marvin Banks under circumstances that would be murder, except that he cause the death under the influence of extreme emotional disturbance for which there was a reasonable excuse. You should determine the reasonableness of the excuse from the viewpoint of a person in Courtney Pollard's situation under the circumstances as he believed them to be.

The circuit court refused to instruct the jury on manslaughter, finding that the facts and evidence presented at trial did not provide a basis for the instruction.

■ A jury instruction on extreme-emotional-disturbance manslaughter under § 5–10–104(a)(1) requires evidence that the defendant killed the victim following provocation such as "physical fighting, a threat, or a brandished weapon." *Boyle v. State*, 363 Ark. 356, 362, 214 S.W.3d 250, 253 (2005) (quoting *Kail v. State*, 341 Ark. 89, 94, 14 S.W.3d 878, 881 (2000)). Pollard cites *Rainey v. State*, 310 Ark. 419, 837 S.W.2d 453 (1992), and *Whittier v. State*, 84 Ark.App. 362, 141 S.W.3d 924 (2004), to assert that "passion may reduce a homicide from murder to manslaughter." In *Rainey*, this court discussed the level of passion resulting from a provocation that may reduce a homicide from murder to manslaughter as follows:

The passion that will reduce a homicide from murder to manslaughter may consist of anger or sudden resentment, or of fear or terror; but the passion springing from any of these causes will not alone reduce the grade of the homicide. There must also be a provocation which induced the passion, and which the law deems adequate to make the passion irresistible. An assault with violence upon another who acts under the influence thereof may be sufficient to arouse such passion.... [M]ere threats or menaces, where the person killed was unarmed and neither committing nor attempting to commit violence on the defendant at the time of the killing, will not free him of the guilt of murder.

310 Ark. at 423, 837 S.W.2d at 455 (quoting *Wootton v. State*, 232 Ark. 300, 337 S.W.2d 651 (1960)). However, the court explained further that "adequate provocation *can* occur when the victim is armed or is attempting to commit violence toward the defendant." *Id.* at 423–24, 837 S.W.2d at 455–56 (emphasis added).

Although Pollard relies on *Rainey* and *Whittier* for support of his argument, both cases are distinguishable from the facts of the present appeal in one important aspect: in *Rainey* and *Whittier* there was evidence that the victim actually possessed a gun and either fired it or threatened to fire it at the defendant at the time of the homicide. This court discussed the relevant facts in *Rainey* as follows:

Rainey, who was approximately 25, and Kirkpatrick, a middle-aged woman, had known each other for several years and had engaged in sexual intercourse on at least three occasions. On March 6, 1991, at approximately 7:00 p.m., Rainey went to visit Kirkpatrick at her house, carrying a loaded semi-automatic pistol. Rainey testified he carried the gun for protection. Testimony revealed that both Rainey and Kirkpatrick had been drinking that day, and Rainey had been smoking marijuana. Kirkpatrick let Rainey into her house through the side door, and he placed the pistol on the kitchen bar. They engaged in sexual intercourse in the bedroom.

Afterward, according to Rainey's testimony, they had a heated argument. Kirkpatrick told Rainey she was going to tell his wife about their affair and "ruin his family." She then got dressed and walked into the front room. Rainey presumed Kirkpatrick was getting a beer from the kitchen. The argument continued while Rainey was dressing in the bedroom. Rainey called Kirkpatrick an "old whore" and told her he was not going to see her anymore.

Upon walking into the front room, Rainey testified he saw Kirkpatrick pointing the pistol at him. He grabbed her hand, pointed the gun toward the ceiling, and a shot fired. Police later recovered a bullet from the ceiling. Rainey then took the gun away from Kirkpatrick and shot her four times in the head as she was falling to the floor. He testified that after the first shot he was so hysterical that he kept firing. The entire incident, according to Rainey, took one or two seconds.

Rainey admitted he did not shoot Kirkpatrick in self defense. He stated, "I just went hysterical," and "I was already mad and I just took the gun away from her and shot her." Rainey said he killed Kirkpatrick out of anger because she had threatened to tell his wife about their affair and had tried to shoot him. *Rainey,* 310 Ark. at 421, 837 S.W.2d at 454.

The trial court denied Rainey's request to instruct the jury on manslaughter. Upon review, this court reversed the trial court, holding that a manslaughter instruction was warranted because

the jury was presented with evidence that Rainey shot Kirkpatrick while in a fit of anger aroused by being threatened with a gun. The jury could have believed that his anger provoked an extreme emotional disturbance for which

there was a reasonable excuse, and thus it could have found Rainey guilty of manslaughter rather than murder in the first degree.

*Id.* at 424, 837 S.W.2d at 456.

Similarly, *Whittier* involved an armed victim and a trial court's refusal to instruct the jury on manslaughter. The court of appeals reversed, holding that the trial court erred because there was a rational basis for the manslaughter instruction. Specifically, there was evidence that the appellant pulled a gun and shot the victim only after the victim fired at the appellant twice before his gun malfunctioned. *Whittier,* 84 Ark.App. at 367, 141 S.W.3d at 927. Further, in contrast to the present case, police officers found a pistol on the victim's body at the crime scene. *Id.* at 363, 141 S.W.3d at 925.

The only evidence in this case that would potentially support a manslaughter instruction was Pollard's own testimony, summarized as follows:

- Banks believed that Pollard was a "snitch."
- On the night of the shooting, Banks flagged down the vehicle Pollard was riding in as a passenger, and berated Pollard by stating "Bitch, mother-fuckin', why you snitchin' on me?"
- Banks showed Pollard the butt of a pistol and told Pollard, "I blow yo' ass off."
- After Pollard got back into the vehicle and was driven to the next street, Banks began to approach Pollard's vehicle and told Pollard, "Bitch, mother-fucker, it's on."
- Banks wrapped his fist in something, went down behind a car, stood up, and then continued to approach Pollard.
- Pollard was "scared."
- Banks had something in his hand as he approached Pollard as he kept telling

Pollard, "Bitch, mother-fucker, you a snitch."

- As the victim raised his hand, Pollard shot him.
- Pollard did not see a gun in Banks's hand, but thought that Banks had a gun and was going to kill him.

Again, unlike *Rainey* and *Whittier*, there was no testimony or other evidence that Banks actually threatened Pollard with a gun at the time of the killing. Pollard testified that he "believed" that Banks had a gun, and on cross-examination testified that Banks showed him the butt of a pistol when he stated "I blow yo' ass off." However, no weapon was found on Banks's body or at the crime scene. Thus, the only evidence of threats or provocation that remotely approached the level required for a manslaughter instruction is Pollard's own self-serving testimony.

In *Morris v. State*, 351 Ark. 426, 434, 94 S.W.3d 913, 918 (2003), we addressed such self-serving testimony in the context of a trial court's refusal to instruct the jury on manslaughter.[2] We affirmed the trial court's refusal to instruct the jury on manslaughter, stating: "In our judgment, the circuit court properly could discount the self-serving testimony of Morris that threats were made and the contradictory testimony of [a witness]." *Id.* at 435, 94 S.W.3d at 918. Morris had testified that the victim was driving a car and almost hit Morris in a nightclub parking lot. Later that night, according to Morris, the victim pulled up next to a car he was riding in at a stop light, and an occupant of the victim's car began to roll down a window. Morris testified that he "thought he saw a gun, panicked, and shot [the victim]." *Id.* at 432, 94 S.W.3d at 917. One other person testified that threats came from the

victim's car, but that witness admitted on cross-examination that he "probably had told the police officers following the shooting that no threats were made." *Id.*

Morris relied on *Harshaw v. State*, 344 Ark. 129, 39 S.W.3d 753 (2001) for support. However, this court found that the facts were distinguishable, stating that "in *Harshaw*, there was evidence to the effect that the victim had a gun and intended to use it." *Morris*, 351 Ark. at 432, 94 S.W.3d at 917. This court stated that

> the *Harshaw* case with its reference to a weapon stands in marked contrast to this case where there is no proof, and not even an indication, that the occupants of [the victim's] car had weapons. Furthermore, the only indications that "threats" were made was Morris's self-serving testimony and [a witness's] contradictory testimony.

*Id.* at 433, 94 S.W.3d at 917–18. We also noted that in *Harshaw*, the appellant and *"other eyewitnesses"* provided evidence. *Id.* (emphasis added).

The facts in the present case are in line with *Morris* and unlike those in *Harshaw*. Here, like *Morris*, there is no evidence that the victim actually threatened Pollard with a gun at the time of the shooting. Additionally, the only testimony of threats made against Pollard came from Pollard's own testimony. This is in contrast to *Harshaw*, where several other eyewitnesses witnessed the threats. Further, in contrast to *Rainey* and *Whittier*, Pollard's testimony is contradicted by several witnesses. For example, Ozie Williams testified that Banks was standing still when Pollard shot him. Eva Moore testified that Pollard stated that "he was going to

---

2. The proffered manslaughter instruction at issue in *Morris* was based on both extreme-emotional-disturbance manslaughter under § 5–10–104(a)(1), and reckless manslaughter under § 5–10–104(a)(3). 351 Ark. at 431–32, 94 S.W.3d at 916.

shoot" Banks before the incident and that she did not see Banks with a gun.

Even if this court accepts Pollard's self-serving testimony as potential evidence to support a manslaughter instruction, Banks "threats" as testified to by Pollard do not provide a rational basis for the instruction. As noted above, "mere threats or menaces, where the person killed *was unarmed and neither committing nor attempting to commit violence* on the defendant at the time of the killing, will not free him of the guilt of murder." *Rainey*, 310 Ark. at 423, 837 S.W.2d at 455 (emphasis added). There was no testimony that Banks assaulted Pollard or was violently assaulting Pollard when he shot Banks. Further, Pollard drove away from Banks after Banks allegedly showed him the butt of a pistol and stated, "I blow yo' ass off." In *Bankston v. State*, 361 Ark. 123, 129, 205 S.W.3d 138, 143 (2005), this court stated that "the element of emotional disturbance may be proven by evidence of an external event calculated to arouse or provoke a reasonable person to take the actions that resulted in the victim's death." Although Pollard testified that Banks showed him the butt of a pistol earlier and stated, "I blow yo' ass off," there was a delay in time and separation of distance between the moment when Banks threatened Pollard and when Pollard shot Banks. *See, e.g., Jackson, supra*. With this delay in time after the alleged provocation, and the fact that Pollard did not testify that he actually saw Banks with a weapon in his hand at the time of the killing, we cannot say that the trial court abused its discretion in finding that no rational basis existed for giving the manslaughter instruction.

In sum, even taking into account Pollard's own testimony, the facts of this case do not rise to the level of *Rainey* and *Whittier*, where there was evidence that the victim actually used a weapon to threaten the appellant or fire at the appellant at the time of the killing. Accordingly, the circuit court did not abuse its discretion by refusing to submit a manslaughter instruction to the jury.

For his second point on appeal, Pollard argues that the trial court erred by denying his motion for a mistrial for a violation of Ark. R. Evid. 615, which provides, in pertinent part, that "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion." Carl Banks testified as the State's first witness, and a later witness—Ozie Williams—stated during cross-examination that he had briefly spoken with Carl Banks in a courtroom hallway after Banks testified. According to Williams, they discussed "just what's happening, what's going on, what's been said, what's going on." The trial court denied Pollard's motion for a mistrial and admonished the audience and family members to refrain from speaking with a witness.[3] After proceedings resumed, Williams testified that his conversation in the hallway with Carl Banks was "brief, that he could not recall the specifics of the conversation, and that there was no discussion of Williams's upcoming testimony."

---

3. The record shows that the court made the following admonishment:

All right, ladies and gentlemen, I'm going to inform the audience for the last time; I don't want to hear any statement whatsoever that any one of the family members, any spectator, or anyone else, talks to a witness about anything. If I hear of it again, somebody is going to jail. And that will be for contempt, and contempt is as long as I want to make it. So if you want to go to jail and stay there until I get old and gray, just try it. All right, let's continue.

This court has often stated that a mistrial is an extreme remedy that should only be granted when the error is beyond repair and cannot be corrected by any curative relief. *Shelton v. State,* 2009 Ark. 388, 326 S.W.3d 429. Pollard cited no case law that supports his argument that a mistrial is an appropriate remedy for a violation of Ark. R. Evid. 615. To the contrary, in *Blaylock v. Strecker,* 291 Ark. 340, 344, 724 S.W.2d 470, 472 (1987), this court stated as follows:

> The rule does not mention the consequences of noncompliance with an order of exclusion, and therefore the sanctions are a matter of case law. The three possible methods of enforcement available to the trial judge are: (1) citing the witness for contempt, (2) permitting comment on the witness's noncompliance in order to reflect on her credibility, and (3) refusing to let her testify. *See* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* 614–15 (1986).

Here, the trial court allowed Pollard to question Williams about the conversation with Banks, reflecting on Williams's credibility. Therefore, the trial court did not abuse its discretion in denying Pollard's motion for a mistrial *See Porter v. State,* 308 Ark. 137, 823 S.W.2d 846 (1992).

As required by Arkansas Supreme Court Rule 4–3(i) (2009), the record in this case has been reviewed for all objections, motions, and requests made by either party that were decided adversely to Pollard. We find no prejudicial error.

Affirmed.