

Cite as 2017 Ark. 10

# SUPREME COURT OF ARKANSAS

No. CR–16–165

| | |
|---|---|
| CHRIS AARON SCHNARR<br>APPELLANT | **Opinion Delivered:** January 26, 2017 |
| V. | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [60CR-13-2176] |
| STATE OF ARKANSAS<br>APPELLEE | |
| | HONORABLE JAMES LEON JOHNSON, JUDGE |
| | <u>AFFIRMED IN PART; REVERSED AND REMANDED IN PART</u>. |

**COURTNEY HUDSON GOODSON, Associate Justice**

A jury in the Pulaski County Circuit Court found appellant Chris Aaron Schnarr guilty of manslaughter for which he received a sentence of ten years' imprisonment. For reversal, Schnarr asserts that the circuit court erred by (1) excluding testimony about the victim's character and previous acts of violence; (2) refusing to declare a mistrial when it was discovered that the court's bailiff had barred members of his family from the courtroom during voir dire; and (3) rejecting instructions on negligent homicide and imperfect self-defense. We granted Schnarr's motion to transfer the appeal to us from the court of appeals in light of his request to overrule precedent established by this court. Therefore, our jurisdiction is pursuant to Arkansas Supreme Court Rule 1-2(b)(5). After considering his arguments, we affirm in part and reverse and remand in part for a new trial.

*Factual Background*

The record reflects that on Saturday, May 11, 2013, Schnarr was driving from North Little Rock when he exited Interstate 30 at Sixth Street and almost collided with a tan SUV that did not yield the right of way. The victim, Arista Aldridge, was the driver of the tan SUV, which was also occupied by Aldridge's girlfriend, Alice Bryant, and their son. As the vehicles drove parallel to one another down the street, Schnarr and Aldridge exchanged profanities and hand gestures through their opened windows. Schnarr turned right onto Sixth Street and into the outside lane. The tan SUV followed in the inside lane of Sixth Street and then pulled in front of Schnarr's vehicle and abruptly stopped. Aldridge, who was not armed, emerged from the SUV and approached Schnarr's vehicle. According to Schnarr, Aldridge was yelling and waving his arms around, and Aldridge also poked Schnarr in the face with his finger. Witnesses to the altercation testified that Aldridge backed away from Schnarr's vehicle. In his testimony, Schnarr stated that Aldridge started to move back toward Schnarr's vehicle and that he pointed his handgun at Aldridge and told Aldridge to leave. Schnarr testified that, when Aldridge did not stop, he fired two shots at Aldridge, who was approximately six feet away from him. He said that Aldridge staggered but regained his balance and advanced toward him again, at which point Schnarr shot at Aldridge a third time. Aldridge fell to the ground and later died. Schnarr had shot Aldridge once in the abdomen and again on the side of Aldridge's right arm. The wound to the abdomen proved to be fatal.

In his testimony, Schnarr, who possessed a concealed-carry permit, also explained that he has a condition called Total Situs Inversus and that he suffers from a faulty heart

valve that has required surgical repair. He testified that his heart condition restricted his activities and prohibited him from playing contact sports. Schnarr stated that he did not see Aldridge with a weapon. In his statement to the police, Schnarr informed the officers that Aldridge had not said that he had a gun, nor had Aldridge threatened to do bodily harm.

The prosecuting attorney charged Schnarr with the offense of first-degree murder. The circuit court gave instructions on the lesser-included offenses of second-degree murder and manslaughter, as well as an instruction on justification, commonly known as self-defense. The jury found Schnarr guilty of manslaughter and sentenced him as previously stated in this opinion.[1] This appeal followed.

*Character Evidence*

Schnarr first argues on appeal that the circuit court erred by excluding evidence of specific instances of Aldridge's past violent conduct that were unknown by him. Schnarr sought to introduce evidence concerning incidents of violence that Aldridge had directed toward Bryant, which had prompted her to obtain orders of protection against Aldridge. He asserts that such evidence is admissible as an essential element of his defense of justification, and he urges this court to overrule our previous decisions limiting the admission of specific instances of a victim's prior violent conduct to those incidents that are within the knowledge of the accused. Schnarr maintains that our decisions on this topic represent a minority view among courts in other jurisdictions. Further, he contends that our caselaw is contrary to Arkansas Code Annotated section 5-2-607 (Supp. 2015), which

---

[1] This was Schnarr's second trial. The first one ended in a mistrial because the jury could not reach a verdict.

sets forth the defense of justification, and he asserts that if the General Assembly had wished to exclude this evidence, it would have done so rather than leave it to the courts to impose such a restriction.

Initially, we reject out of hand Schnarr's assertion that the exclusion of the proposed evidence is not contemplated by section 5-2-607. This statute delineates the substantive components of the defense of justification. It is not a rule of evidence. Pursuant to section 3 of amendment 80 to our constitution, rules regarding pleading, practice, and procedure are solely the responsibility of this court. *C.B. v. State*, 2012 Ark. 220, 406 S.W.3d 796. The rules of evidence are rules of pleading, practice, and procedure that fall within the exclusive domain of this court. *See Nelson v. State*, 2011 Ark. 429, 384 S.W.3d 534. Consequently, Schnarr's claim that the statute poses no bar to the admission of the evidence is misplaced.

The evidentiary rules governing this issue are Rules 404(a)(2) and 405 of the Arkansas Rules of Evidence. Rule 404(a)(2) provides,

> (a) *Character Evidence Generally*. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except;
>
> . . . .
>
> (2) *Character of victim*. Evidence of a pertinent trait of character of the victim of the crime offered by the accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor.

Once the admissibility of character evidence has been established under Rule 404, Rule 405 sets forth the methods of proof that may be utilized. *See Frye v. State*, 2009 Ark. 110, 313 S.W.3d 10. This rule states,

>     (a) *Reputation or Opinion*. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

>     (b) *Specific Instances of Conduct*. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

In *Montague v. State*, 213 Ark. 575, 211 S.W.2d 879 (1948), we succinctly stated our position on the admissibility of character evidence concerning the victim when self-defense is asserted:

> Where character evidence is offered in support of the contention that the deceased was the aggressor or to characterize and explain his acts, the defense is restricted to proof of general reputation in the community where the deceased lived, and may not show particular acts or conduct at specified times. . . . But, on the issue whether or not the accused had reasonable ground to believe himself in imminent danger, he may show his knowledge of specific instances of violence on the part of the deceased.

*Montague*, 213 Ark. at 584, 211 S.W.2d at 884–85 (quoting *Pope v. State*, 172 Ark. 61, 66–67, 287 S.W. 747, 749 (1926)). Thus, when evidence of a victim's propensity for violence is offered to demonstrate that the victim was the aggressor, we have limited the form of the testimony to reputation and opinion. *Halfacre v. State*, 277 Ark. 168, 639 S.W.2d 734 (1982); *McClellan v. State*, 264 Ark. 223, 570 S.W.2d 278 (1978); *Sanders v. State*, 245 Ark. 321, 432 S.W.2d 467 (1968). On the other hand, where the evidence is offered to shed light on the accused's state of mind, we have permitted evidence of specific instances of conduct that were directed at the accused or were within his knowledge. *Smith v. State*,

273 Ark. 47, 616 S.W.2d 14 (1981); *Pope v. State*, 262 Ark. 476, 557 S.W.2d 887 (1977).

When character evidence is offered for this purpose, the requirement that the defendant

have knowledge of the victim's prior acts of violence is a matter of relevancy. As we

observed in *Pope*,

> Clearly, evidence of specific acts of violence by the deceased is inadmissible where the defendant had no knowledge or had not been informed of such acts prior to the homicide, since, naturally, his mind could not have been materially affected in the absence of such knowledge. . . However, according to most courts, and the trend of modern authority, if, prior to the homicide, the defendant, either through his own observation or through information communicated to him by others, including the deceased himself, knew of other acts of violence of the deceased, he may, in support of his contention that he had reasonable grounds to believe himself in imminent danger from an assault by the deceased, introduce evidence of such prior unlawful acts of violence by the deceased. Such evidence bears on the question whether the defendant reasonably apprehended danger to his life or of great bodily injury.

*Pope*, 262 Ark. at 481–482, 557 S.W.2d at 890 (quoting 40 Am. Jur. 2d *Homicide*, § 306

(1968)).

Schnarr refers to cases from other jurisdictions which hold that specific instances of

the victim's violent conduct are admissible as proof of who was the aggressor, even if the

defendant possesses no knowledge about the incidents. *See, e.g.*, *State v. Hill*, 885 S.W.2d

357 (Tenn. Crim. App. 1994). However, when the evidence is offered to show the

accused's state of mind, courts adhere to our view that the accused must have knowledge of

the victim's past acts of violence as a prerequisite for admissibility. As recognized by the

Supreme Judicial Court of Massachusetts, almost every American jurisdiction requires prior

knowledge as a predicate to admission when the basis for introducing the testimony is to

show that the defendant was reasonably apprehensive for his safety. *Commonwealth v.*

*Adjutant*, 824 N.E.2d 1, 6 (Mass. 2005). *See also* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 405.05(4) (2d ed. 2013); 1A Wigmore, *Evidence* § 63 (Tillers rev. 1983). Therefore, the purpose for which Schnarr offered the evidence is critical to our review.

> In his brief filed in the circuit court, Schnarr argued,

> *Of course, this was an altercation initiated by the deceased.* When there is no dispute that the defendant killed the deceased; the defendant asserts that he acted in self-defense; and although there are witnesses to the shooting, there are no other witnesses to what was said, the fact that the deceased was a hot-tempered bully with a habit of threatening persons who displeased him is an essential element of Schnarr's defense. *Schnarr is entitled to corroborate his sensations of Aldridge's conduct with corroborative evidence of Aldridge's prior conduct.*

The italicized portion of the argument demonstrates that Schnarr considered it settled that Aldridge was the aggressor and that the purpose for which he sought to introduce the testimony pertained to the issue of his state of mind and whether he reasonably apprehended danger to his life or of great bodily injury. Consequently, based on our caselaw, which is consistent with that from other jurisdictions, the circuit court did not abuse its discretion by disallowing testimony of Aldridge's past violent conduct of which Schnarr had no knowledge. *Dickey v. State*, 2016 Ark. 66, 483 S.W.3d 287 (stating the standard of review that we do not reverse evidentiary rulings absent a manifest abuse of discretion).[2]

---

[2] We note that Schnarr contends in his brief to this court that the evidence was admissible to corroborate his testimony that Aldridge was the aggressor at the moment the shots were fired. This argument was not made below. It is well settled that a party is bound by the nature and scope of the objections and arguments made at trial and may not enlarge or change those grounds on appeal. *Stewart v. State*, 2012 Ark. 349, 423 S.W.3d 69; *Frye v. State*, 2009 Ark. 110, 313 S.W.3d 10.

SLIP OPINION

In connection with this argument, Schnarr also asserts that the exclusion of the evidence denied him the constitutional right to present a defense. We disagree.

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). However, the Supreme Court has also recognized that "state and federal lawmakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). The right to present a complete defense is abridged by evidentiary rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 58 (1987)). Only rarely has the Court held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. *Nevada v. Jackson*, 133 S. Ct. 1990 (2013). "[T]he Constitution permits judges to exclude evidence that is "repetitive . . ., only marginally relevant" or poses an undue risk of "harassment, prejudice, [or] confusion of the issues." *Holmes*, 547 U.S. at 326–27. Here, the proffered evidence was not relevant for the purpose for which it was offered because events of which Schnarr was not aware could have had no effect on his state of mind. Therefore, the exclusion of the evidence was not arbitrary and did not violate Schnarr's constitutional right to present a complete defense.

*Public Trial*

Schnarr next argues that the circuit court erred in refusing to quash the selected jury and to declare a mistrial when his counsel learned that the court's bailiff had excluded members of Schnarr's family from the courtroom during voir dire. He contends that this action deprived him of his constitutional right to a public trial. We find merit in this argument.

On this point, the record reflects that voir dire began at 10:13 a.m., and the court recessed for lunch at 12:50 p.m. Court reconvened at 2:00 p.m., at which time the defense announced that it would not exercise any additional peremptory strikes. With that statement, the twelfth juror was immediately seated, as well as two alternates. The circuit court swore in the jury and took a brief recess for the convenience of the jurors at 2:07 p.m. At 2:20 p.m., outside the presence of the jury, defense counsel informed the circuit court that he had learned "a few minutes ago" that members of Schnarr's family had been excluded from the courtroom during voir dire. Citing *Presley v. Georgia*, 130 S. Ct. 721 (2010) (per curiam), he moved to quash the jury and to declare a mistrial based on the denial of Schnarr's constitutional right to a public trial. In response, the prosecution argued that *Presley*, where the trial court had ordered the closure of the courtroom, was distinguishable because in this instance any exclusion was accomplished at the request of the bailiff, unbeknownst to the parties or the court. The prosecution also argued that the room was overcrowded because two jury panels were in attendance and noted that a public defender, who was not a party to the case, was in the courtroom to observe voir dire.

The circuit court ruled that the courtroom was not closed and that Schnarr was not denied the right to a public trial. Later, Schnarr renewed his motion, and he proffered the testimony of his family members.[3] Schnarr's brother, Roy, testified that the bailiff asked him to leave the courtroom when the venire was brought into the courtroom. Serena Schnarr, Roy's wife, also stated that she and Roy were asked to leave before the prospective jurors entered the courtroom. Judy Seigrist, Schnarr's aunt, also testified that she was denied admittance to the courtroom while the jury was being selected. Following the proffer, the prosecutor continued to argue that the courtroom was not closed, noting that in addition to the public defender, a member of the press was present in the courtroom during voir dire. The circuit court denied Schnarr's renewed motion.[4]

Before reaching the merits of Schnarr's argument, we must address the State's contention that the question is not preserved for appeal because Schnarr failed to raise a contemporaneous objection at the time the alleged violation occurred. In response, Schnarr asserts that he brought the matter to the circuit court's attention at the first opportunity once he learned of the closure.

---

[3] The circuit court left the courtroom during the proffer of the testimony. We also note that the prosecution did not offer the testimony of the circuit court's bailiff, although she expressed the intention to do so.

[4] In its brief, the State also asserts that a Nick Wade was in the courtroom. During the trial, a juror advised the circuit court that she had seen Wade in the courtroom prior to the selection of the jury. Wade was her landlord, and she had learned that he was a friend of Schnarr's. She said that Wade walked to the front of the courtroom and then sat in the back of the courtroom. She also stated that he left and that she "didn't see him the rest of the court." The court excused her from the jury. Because the juror stated that Wade left the courtroom, we cannot accept the State's assertion that Wade attended voir dire.

The law is well settled that to preserve an issue for appeal, a defendant must object at the first opportunity, and a motion for mistrial must likewise be made at the first opportunity. *Vance v. State*, 2011 Ark. 243, 383 S.W.3d 325. In order to be timely, an objection must be contemporaneous, or nearly so, with the alleged error. *Jones v. State*, 374 Ark. 475, 288 S.W.3d 633 (2008); *Smith v. State*, 330 Ark. 50, 953 S.W.2d 870 (1997). "To preserve a point for appeal, a proper objection must be asserted at the first opportunity after the matter to which objection has been made occurs." *Mezquita v. State*, 354 Ark. 433, 443, 125 S.W.3d 161, 167 (2003) (quoting *Gamble v. State*, 351 Ark. 541, 549, 95 S.W.3d 755, 760 (2003)). Also, every reasonable presumption must be indulged against the waiver of fundamental constitutional rights. *Dennis v. State*, 2016 Ark. 395, ___ S.W.3d ___. "[L]ike other fundamental trial rights, a right to a public trial may be relinquished only upon a showing that the defendant knowingly and voluntarily waived such a right." *Walton v. Briley*, 361 F.3d 431, 434 (7th Cir. 2004). Here, the actions of the circuit court's bailiff were not known by Schnarr and his counsel; thus, there was no knowing and voluntary waiver of this right. Otherwise, this court is satisfied that Schnarr raised the denial of his right to a public trial at the first opportunity after discovering that his family had been excluded from the courtroom. Accordingly, we hold that the issue is preserved for appeal.

Turning to the merits of the argument, the Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Likewise, article 2, section 10 of the Arkansas Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" We have recognized that "[t]he right to a public trial is one of the most

important safeguards in the prosecution of persons accused of crime." *Sirratt v. State*, 240 Ark. 47, 53, 398 S.W.2d 63, 66 (1966) (quoting *People v. Murray*, 50 N.W. 995, 997 (Mich. 1891)). "The right to a public trial has long been viewed as 'a safeguard against any attempt to employ our courts as instruments of persecution.'" *United States v. Thunder*, 438 F.3d 866 (8th Cir. 2006) (quoting *In re Oliver*, 333 U.S. 257, 270 (1948)). "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions[.]" *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (quoting *In re Oliver*, 333 U.S. at 270, n.25). "The importance we as a Nation attach to the public trial is reflected both in its deep roots in the English common law and in its seemingly universal recognition in this country since the earliest of times." *Gannett Co. v. DePasquale*, 443 U.S. 368, 414 (1979) (Blackmun, J., concurring in part and dissenting in part). As enunciated by the *Waller* Court, the values advanced by the fundamental right of a public trial are (1) to ensure a fair trial; (2) to remind the prosecutor and the judge of their responsibility to the accused and the importance of their functions; (3) to encourage witnesses to come forward; and (4) to discourage perjury.

We have previously determined that the right to public trial extends to voir dire. *Taylor v. State*, 284 Ark. 103, 679 S.W.2d 797 (1984). In *Presley*, *supra*, the Supreme Court also held that the guarantee of a public trial applies to the jury-selection process. There, the trial court excluded the lone courtroom observer, the defendant's uncle, from the courtroom during voir dire over the defendant's objection and request that "some

accommodation" be made. *Presley*, 558 U.S. at 210. In rejecting the defendant's argument, the trial court found that there would be no space in the courtroom for the public to sit once the jury arrived. In addition, the trial court did not wish the uncle to intermingle with the members of the jury panel.

In reversing the Georgia Supreme Court's affirmance of Presley's conviction, the Court noted that the right to an open trial can be circumscribed in certain situations. However, the Supreme Court commented that "[s]uch circumstances will be rare, however, and the balance of interests must be struck with special care." *Id*. at 213. The Court also expressed the view that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials."

On this subject, courts have stated that whether the closure was intentional or inadvertent is constitutionally irrelevant. *Walton v. Briley*, 361 F.3d 431 (7th Cir. 2004); *Vanness*, 738 N.W.2d 154 (Wis. Ct. App. 2007). On the other hand, another court has concluded that a brief, inadvertent closing of a courthouse, and hence the courtroom, unnoticed by any of the trial participants, did not violate the Sixth Amendment. *United States v. Al-Smadi*, 15 F.3d 153 (10th Cir. 1994). In *Al-Smadi*, the Tenth Circuit also stated that a defendant's right to a public trial is not denied absent "some affirmative act by the trial court meant to exclude persons from the courtroom." *Id*. at 154. Nevertheless, other courts have concluded that a court room may be closed in the constitutional sense without an express judicial order. *See, e.g.*, *Owens v. United States*, 483 F.3d 48 (1st Cir. 2007); *Martineau v. Perrin*, 601 F.2d 1196 (1st Cir. 1979); *Watters v. State*, 612 A.2d 1288 (Md. 1992); *Commonwealth v. Cohen*, 921 N.E.2d 906 (Mass. 2010).

Our research also reveals that not every closure rises to the level of a constitutional deprivation, as trivial, or *de minimus*, closures may not violate the right to a public trial. *See Kelly v. State*, 6 A.3d 396 (Md. Ct. Spec. App. 2010). In this regard, courts have recognized that a temporary closure may, at times, not violate the Sixth Amendment. *Peterson v. Williams*, 85 F.3d 39 (2nd Cir. 1996). Federal courts of appeals have held that closures are trivial when the core values of the Sixth Amendment have not been violated. V*anness*, *supra* (citing *Walton*, *supra*). Under a triviality standard, the question is whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant of the protections conferred by the Sixth Amendment. *Peterson*, *supra*. Moreover, courts that have considered the question have continued to conduct triviality analyses in the wake of the holding in *Presley* that the Sixth Amendment extends to voir dire proceedings. *United State v. Greene*, 431 Fed. Appx. 191 (3rd. Cir. 2011); *Barrows v. United States*, 15. A.3d 673 (D.C. Cir. 2011); *Kelly v. State*, 6 A.3d 396 (Md. Ct. Spec. App. 2010).

In determining whether a courtroom closure is so *de minimus* or trivial that it does not abridge a defendant's Sixth Amendment right to a public trial, courts apply various factors, which include the length of the closure; the significance of the proceedings that took place while the courtroom was closed; and the scope of the closure, meaning whether it was a total or partial closure of the courtroom. *Kelly*, *supra*. As observed by the Maryland Special Court of Appeals in *Kelly*, although the length of time is not dispositive, closures of less than an hour have been considered *de minimus*. *See Peterson*, *supra*; *People v. Bui*, 107 Cal. Rptr. 3d 585 (Cal. Ct. App. 2010). When the closure is for a day or longer, courts have declined to classify the closure as *de minimus*. *Kelly*, *supra* (citing *Owens*, *supra*; *Cohen*,

*supra*).  Where the closure consumes a matter of hours but less than one day, courts have reached conflicting results.  *Kelly*, *supra*.  For example, in *State v. Torres*, 844 A.2d 155 (R.I. 2004), the exclusion of two sisters for an entire morning during voir dire, which encompassed the entire jury-selection process, was not considered trivial.  Conversely, in *Gibbons v. Savage*, 555 F.3d 112 (2d Cir. 2009), the exclusion of the defendant's mother during the first afternoon of voir dire that took place over several days was classified as *de minimus*.

In *Kelly*, the trial court was not aware that its bailiff had asked the defendant's family to leave to make way for the jury during voir dire.  Applying the factors it had identified, the court determined that the closure during voir dire was trivial because the exclusion lasted only a couple of hours; it did not encompass the entire voir-dire process during which a significant portion could not be heard by spectators; and the closure was partial and not a total exclusion of all spectators.  By contrast, the Maryland Court of Appeals in *Watters*, *supra*, found a violation of the right to a public trial substantial after a deputy sheriff closed the courtroom to all but court personnel for the entire jury-selection process that took place over the course of one morning.  The court also rejected the State's contention that no violation occurred because the trial court was not aware of the deputy sheriff's actions.

In the case at bar, we disagree with the circuit court's conclusion that the courtroom was not closed.  Although an attorney and a member of the press were said to be in attendance, the fact remains that three members of Schnarr's family were excluded from the courtroom.  Thus, there was a closure.  We are also of the opinion that it is not constitutionally significant that the closure was not accomplished at the express direction of

the circuit court. By whatever means it was achieved, the result remains a closure. In further evaluating this issue, we adopt the three factors espoused by the *Kelly* court: (1) the length of the closure; (2) the significance of the proceedings that took place while the courtroom was closed; and (3) the scope of the closure. In addition, we note that our analysis does not require a demonstration of actual prejudice, as both this court and the Supreme Court have held that a showing of prejudice is not necessary in determining whether the right to a public trial has been violated. *Waller, supra*; *Sirratt, supra*; *Taylor, supra*.

Here, the record discloses that the closure covered the entire morning of trial, a period of two hours and thirty-seven minutes. It encompassed all but a few moments of the jury-selection process. According to precedent, the right to a public trial extends to voir dire. *Presley, supra*; *Taylor, supra*. The Supreme Court has recognized that jury selection is a crucial part of any criminal case, as it "is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice . . . or predisposition about the defendant's culpability." *Gomez v. United States*, 490 U.S. 858, 873 (1989). In terms of scope, the closure was partial because not all members of the public were excluded. Weighing these factors, we cannot conclude that the closure was trivial, and we hold that Schnarr was deprived of his constitutional right to a public trial. Consequently, we reverse and remand for a new trial.

### Jury Instructions

As his final point on appeal, Schnarr asserts that the circuit court erred by refusing to give instructions on negligent homicide and imperfect self-defense. The State responds that no rational basis exists in the evidence for the circuit court to have given these instructions.

A party is entitled to a jury instruction when it is a correct statement of law and when there is some basis in the evidence to support giving the instruction. *Johnson v. State*, 2016 Ark. 156, 489 S.W.3d 668. We have often stated that the refusal to give an instruction on a lesser-included offense is reversible error if the instruction is supported by even the slightest evidence. *Starling v. State*, 2016 Ark. 20, 480 S.W.3d 158. However, we will affirm the circuit court's decision to not give an instruction on a lesser-included offense if there is no rational basis for doing so. *Friar v. State*, 2016 Ark. 245. This court will not reverse a trial court's ruling on the submission of a lesser-included jury instruction absent an abuse of discretion. *Pollard v. State*, 2009 Ark. 434, 336 S.W.3d 866.

A person commits the offense of negligent homicide if he or she negligently causes the death of another person. Ark. Code Ann. § 5-10-105(b)(1) (Repl. 2013). The term "negligently" is defined under Arkansas Code Annotated section 5-2-202(4) (Repl. 2013) as follows:

> (A) A person acts negligently with respect to attendant circumstances or a result of his or her conduct when the person should be aware of a substantial and unjustifiable risk that the attendant circumstances exist or the result will occur.

> (B) The risk must be of such a nature and degree that the actor's failure to perceive the risk involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation considering the nature and purpose of the actor's conduct and the circumstances known to the actor.

Here, Schnarr intentionally fired three shots at Aldridge at fairly close range. Thus, there is no evidence to justify a finding that Schnarr was unaware that his conduct, or the risk of his conduct, would result in Aldridge's death. *See Jones v. State*, 2012 Ark. 38, 388 S.W.3d 411 (affirming a circuit court's refusal to give an instruction on negligent homicide

where the appellant shot his ex-wife through a window with a scoped rifle); *Norris v. State*, 2010 Ark. 174, 368 S.W.3d 52 (affirming a circuit court's decision declining to give an instruction on negligent homicide where the appellant struck the victim in the head with a two-by-four).

We also conclude that the circuit court did not abuse its discretion by failing to give an instruction based on imperfect self-defense, which is based on Arkansas Code Annotated section 5-2-614 (Repl. 2013):

> (a) When a person believes that the use of physical force is necessary for any purpose justifying that use of physical force under this subchapter but the person is reckless or negligent either in forming that belief or in employing an excessive degree of physical force, the justification afforded by this subchapter is unavailable in a prosecution for an offense for which recklessness or negligence suffices to establish a culpable mental state.

In *Harshaw v. State*, 344 Ark. 129, 39 S.W.3d 129 (2001), we reversed the circuit court's refusal to provide an imperfect-self-defense instruction. There, the victim had threatened to use a gun during the altercation and was shot after he reached inside a car window. Given the victim's threats and actions, we concluded that there was some evidence to support a finding that Harshaw acted on the basis of an unreasonable or a recklessly formed belief that he needed to use deadly force to protect himself. By contrast, in *Butler v. State*, 2011 Ark. 369, we upheld the denial of an instruction on imperfect self-defense because there was no evidence that the victim threatened harm or had brandished a weapon. Accordingly, it could not be said that Butler shot the victim under a reckless belief that the victim posed a threat.

The circumstances of the present case are more like those in *Butler*. There is no evidence that Aldridge appeared to be armed or that he had made any threats to indicate

that he was armed. Moreover, Schnarr denied that Aldridge had threatened him with bodily harm. Consequently, there was no rational basis for giving the instruction, and we hold that the circuit court did not abuse its discretion in refusing the proffered instruction on imperfect self-defense.

In this point on appeal, Schnarr asks that we overrule our decision in *Kemp v. State*, 324 Ark. 178, 919 S.W.2d 943 (1996), in which he claims that this court held that courts are not required to give an instruction based on section 5-2-614 because there is no model instruction on the subject. However, in that case we merely held that the circuit court did not err by refusing the proffered instruction because it omitted a phrase contained in the statute and was thus incomplete.

Affirmed in part; reversed and remanded in part.

HART, J., concurs.

WOMACK, J., concurs in part and dissents in part.

**JOSEPHINE LINKER HART, Justice, concurring.** I concur but write separately to address two of the points raised by Chris Schnarr on appeal.

First, Schnarr sought to introduce evidence about a history of domestic violence involving the victim, Arista Aldridge, and his girlfriend, Alice Bryant. In my view, though not the majority's, Schnarr's argument on appeal is that he should have been permitted to introduce this evidence to establish that Aldridge remained the aggressor in order to counter testimony that Aldridge retreated from Schnarr.

Rule 404(a)(2) permits the introduction of "[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor." Further, "[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct. Ark. R. Evid. 405(a) (2016).

Accordingly, if Aldridge had a history of road-rage incidents, then specific instances of this pertinent character trait would have been admissible to establish that he was the aggressor here. Thus, we should not preclude the admissibility of specific instances of pertinent character traits relating to the victim who acts as the aggressor, though the majority asserts that proposition with approval in dicta. Here, however, the evidence did not relate to road-rage incidents, so the evidence would not have been evidence of a specific instance of a pertinent character trait.

Second, Schnarr argues that the circuit court erred in refusing to give the jury an instruction on the crime of negligent homicide, which requires proof that a person negligently caused the death of another person. Ark. Code Ann. § 5-10-105(b)(1) (Repl. 2013). He asserts that he was entitled to the instruction because, while he thought he was justified in using physical force, arguably, he was negligent either in forming the belief that the use of physical force was necessary or in employing an excessive degree of physical force. Ark. Code Ann. § 5-2-614(a). This same subsection, however, further provides that this justification defense "is unavailable in a prosecution for an offense for which recklessness or

negligence suffices to establish a culpable mental state." Thus, this defense would have been unavailable for the crime of negligent homicide.

**SHAWN A. WOMACK, Justice, concurring in part and dissenting in part.**

I agree with the judgment of majority that the sentence should be reversed. I write separately to concur in part and to dissent in part. I believe that Schnarr should be allowed an imperfect self-defense instruction at trial based upon the facts in the record. Further, I would agree with the majority on the need to adopt the Kelly factors for the purpose of evaluating a public-trial issue, but would find that those factors weigh against a finding that there was not a public trial in this case. Finally, I would concur with the majority on the issue of character evidence.

## I. *Imperfect Self-Defense*

On Saturday, May 11, 2013, Christopher Schnarr, a college student at the University of Arkansas at Little Rock, left his home in North Little Rock to travel to his place of employment in downtown Little Rock so that he could use his employer's computer to complete a college assignment. As he exited Interstate 30, he had to swerve his vehicle to avoid a collision with a vehicle traveling on the frontage road driven by Arista Aldridge. Schnarr had the right-of-way over the Aldridge vehicle, which had failed to yield to the interstate traffic as required.

After the near collision, the two men briefly exchange profanities at the intersection from within their vehicles and Schnarr continued on his predetermined route to 6th Street on his way to his office. At that moment, Aldridge altered his own route and began to pursue the Schnarr vehicle. Aldridge ultimately overtook the Schnarr vehicle and cut off

the appellant, forcing him to come to a stop on 6th Street with the Aldridge vehicle blocking the forward escape route of the Schnarr vehicle. Schnarr also stated that he did not think he could drive away because there appeared to be other vehicles in his rear-view mirror.

Aldridge exited his vehicle, and in an angry and aggressive manner, approached Schnarr in his trapped vehicle while screaming profanities at him. Aldridge proceeded to place his hands on the driver's-side doorframe of the appellant's vehicle and ultimately physically assaulted Schnarr, poking him in the face repeatedly.

Schnarr testified that he was in fear for his life because this man, who was unknown to him, forced his vehicle to stop, blocked his escape path, exited his own vehicle to approach the appellant's vehicle in a hostile manor, screamed profanity at him, and repeatedly physically assaulted him. He also testified that when his vehicle was forced to stop that he had reached under his seat and placed his gun in his lap for protection. During the initial portion of the incident, Schnarr did not fire his weapon at Aldridge, either through personal restraint or having frozen in fear.

Aldridge eventually turned and walked away from the appellant's vehicle to the center of the road, approximately the width of one lane away. Aldridge then turned back to face Schnarr who had now raised his firearm and pointed it at Aldridge, telling him to leave. It is undisputed that Aldridge turned back toward Schnarr. There is some dispute as to whether Aldridge moved back toward Schnarr's direction or simply turned to face him. However, Schnarr testified that he believed that Aldridge was coming back at him after he had warned him to leave and displayed his firearm. Schnarr fired three shots, hitting Aldridge twice on the front side of his body.

Schnarr testified that he is a valid concealed-carry licensee and that he often carries a firearm for protection because he lives and travels in dangerous areas. He testified further that he had never before fired his firearm at another person nor had he been in a situation where he felt that he had to deploy his weapon. He fired in this instance only because he felt trapped and in fear for his personal safety or in fear for his life.

We have been clear that "[i]t is reversible error to refuse to give an instruction on a lesser-included offense when the instruction is supported by even the slightest evidence." *Harshaw v. State*, 344 Ark. 129, 132, 39 S.W.3d 753, 755 (2001). On appeal, this court will uphold a trial court's decision if there is no rational basis for giving the instruction. *Id.*

A defendant is entitled to an imperfect-self-defense instruction if he either recklessly or negligently formed the belief that force was necessary to defend himself. Ark. Code Ann. § 5-2-614(a) (Repl. 2013); *Harshaw*, 344 Ark. at 135 n.1, 39 S.W.3d at 756 n.1. Criminal negligence occurs when someone should be aware of a "substantial and unjustifiable risk" that the result will occur. Ark. Code Ann. § 5-2-202(4)(A) (Repl. 2013). Ordinarily, negligent homicide would be unavailable to a defendant in the current circumstances. However, if a defendant can establish that he negligently formed the belief that self-defense was justified, then he would be entitled to an instruction based on negligent homicide. *Harshaw*, 344 Ark. at 135 n.1, 39 S.W.3d at 756 n.1.

The cases in which we have denied an imperfect self-defense instruction are vastly different than the current circumstances. In *Kemp* we determined that there was no rational basis for the defendant to argue the he recklessly or negligently formed the belief that he needed to defend himself when he left the scene of the crime, got a gun, returned, and then

opened fire while entering the door. *Kemp v. State*, 348 Ark. 750, 763, 74 S.W.3d 224, 230 (2002). Likewise, in *Butler v. State*, as the majority points out, this court found that there was no rational basis to offer an instruction on imperfect self-defense when there was no evidence the victim had a weapon or threatened the victim. 2011 Ark. 369, at 3–5.. However, we also noted in that case that the defendant could have taken a route to avoid the victim, he obstructed the victim's vehicle, and he specifically stated that he was not scared of the victim. *Id.*

It is clear, based on the facts in the present case, that there is at least a rational basis to conclude that Schnarr negligently formed the belief that he needed to use deadly force to defend himself. The circuit court therefore committed reversible error when it denied Schnarr the instruction.

## II. *Public Trial*

While I agree with the factors the majority has adopted, I disagree with the result. The pertinent factors are (1) the length of the closure; (2) the significance of the proceedings that took place while the courtroom was closed; and (3) the scope of the closure. *Kelly v. State*, 6 A.3d 396, 407 (Md. Ct. Spec. App. 2010). In the present case, the courtroom was closed two hours and thirty-seven minutes during a three-day jury trial. As the majority has noted, constitutional protections still apply during voir dire; however, no evidence was presented during that time. The courtroom here was either full, or nearly full, with the jury panel. Lastly, the courtroom was only partially closed because a member of the press and another member of the bar were watching the proceeding. When considering these factors, the courtroom's partial closure was *de minimus* and not grounds for a new trial. Three

members of the defendant's family were prevented from entering a partially closed courtroom for less than three hours of a three-day trial during a non-evidentiary procedure. The partial closing here does not rise to a level that would undermine the fairness of the proceedings. I would, therefore, affirm the circuit court's decision.

*Jeff Rosenzweig*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Adam Jackson*, Ass't Att'y Gen., for appellee.