Cite as 2020 Ark. App. 249 VACATED BY 2021 Ark. 5

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CR–19–684

| | |
|---|---|
| | **OPINION DELIVERED:** APRIL 22, 2020 |
| BOBBY KELLENSWORTH<br>APPELLANT | APPEAL FROM THE GRANT COUNTY CIRCUIT COURT<br>[NO. 27CR-17-76] |
| V. | HONORABLE EDDY EASLEY, JUDGE |
| STATE OF ARKANSAS<br>APPELLEE | AFFIRMED IN PART; REVERSED AND DISMISSED IN PART |

## ROBERT J. GLADWIN, Judge

Bobby Kellensworth was convicted by a Grant County Circuit Court jury on one count of possession of methamphetamine with intent to deliver (greater than 10 grams but less than 200 grams); two counts of possession of drug paraphernalia; maintaining a drug premises; endangering the welfare of a minor in the first degree; and two counts of possession of a controlled Schedule I or II substance excluding methamphetamine and cocaine (one for hydrocodone, and one for oxycodone). Kellensworth challenges the (1) sufficiency of the evidence supporting two of his convictions for possession of controlled substances—hydrocodone and oxycodone; (2) circuit court's denial of his motion to suppress—related to a discrepancy in the address noted on the affidavit and the search warrant; and (3) circuit court's refusal to allow questioning of law-enforcement witnesses about the alleged inconsistencies in the numerical address of his residence. We affirm in part and reverse and dismiss in part.

## I. *Facts and Procedural History*

The above-listed charges arose from the execution of a search warrant on December 30, 2016, at a mobile home that Kellensworth occupied with his daughter and her mother and where drugs and related paraphernalia also were found. The search warrant was obtained approximately two weeks after two controlled drug purchases by confidential informants from Kellensworth that occurred at the same location.

On January 9, 2018, Kellensworth filed a motion to suppress evidence seized pursuant to the search warrant listing 354 Grant 52 as the place to be searched. The State responded on January 26, and a hearing on the motion to suppress was held on February 26. After taking the motion under advisement, the circuit court entered an order denying Kellensworth's motion on March 7.

Just prior to trial, the State filed a motion in limine to preclude the defense from presenting testimony or evidence related to Kellensworth's precise numerical address and/or a mailbox listing his first initial and last name and showing the numerical address as 386 Grant 52. The State argued that because the circuit court had already ruled that the search warrant was valid and all evidence seized pursuant to it was admissible, any mention of Kellensworth's numerical address or the mailbox listing his name and numerical address would confuse the jury. The circuit court granted the State's motion and specified that defense counsel could not cross-examine the State's witnesses about inconsistent physical addresses listed throughout the law-enforcement documents.

Following the close of the State's evidence at trial, Kellensworth moved for a directed verdict on all counts. Specifically, on the charges of possession of hydrocodone and possession of oxycodone, his counsel argued that mere visual confirmation was insufficient

evidence that the substances were, in fact, what they were purported to be. The circuit court denied the motions. The defense renewed the motions for directed verdict at the close of all the evidence, and they were again denied. The jury found Kellensworth guilty of all seven charged offenses, and he was sentenced to an aggregate term of eighty years' imprisonment. Kellensworth filed a timely notice of appeal, and this appeal followed.

II. *Discussion*

A. Sufficiency of the Evidence on Convictions of
Possession of Hydrocodone/Oxycodone

Kellensworth was charged with one count each of possession of oxycodone and possession of hydrocodone, both Class D felonies, in violation of Arkansas Code Annotated section 5-64-419(b)(2)(A) (Repl. 2016)). He argues that these convictions must be reversed because there was insufficient evidence that the substances seized were, in fact, the actual controlled substances charged. He maintains that mere visual confirmation of the substance by a forensic chemist—without testing and analysis—does not constitute substantial evidence that the substances were the actual substances charged.

At trial, the State introduced certain pills seized by law enforcement during the execution of the search warrant. Forensic chemist Dan Hedges, who was qualified as an expert without objection, testified that the five white unscored pills contained a mixture of hydrocodone and acetaminophen and that another pink pill contained oxycodone. Hedges's crime-lab report, admitted without objection, identified the respective pills as oxycodone and hydrocodone with acetaminophen. The report noted the identification of the pills was "obtained by comparing the item's code imprint to imprint records and not by analytical testing." Hedges testified in support of the report, confirming that the pills were identified

3

by means of a visual inspection and reference to the manufacturer's imprint code using a drug-identification database—drugs.com. He opined that from his training and experience, there was no basis to suspect the pills were other than as identified, so no chemical analysis or further testing was necessary.

Kellensworth submits that several jurisdictions have held that the mere visual identification of prescription drugs is not a sufficiently reliable method of proof in a criminal trial. *See, e.g.*, *People v. Hard*, 342 P.3d 572 (Col. App. Ct. 2014) (holding evidence insufficient to support a possession conviction where the only evidence identifying oxycodone as substance found on defendant's person was trooper's hearsay testimony that he identified the drug by accessing website to match size, shape, and markings, which was inadmissible hearsay evidence, and there was no other evidence confirming that pills were oxycodone); *State v. Ward*, 694 S.E.2d 738, 740, 743–47 (N.C. 2010) (holding expert-witness testimony establishing that a substance is a controlled substance "must be based on a scientifically valid chemical analysis and not mere visual inspection"); *People v. Mocaby*, 882 N.E.2d 1162, 1166–68 (Ill. App. Ct. 2008) (holding evidence insufficient to show that pills were controlled substances where forensic scientist had identified the pills by comparing them to pictures in a book but had not performed chemical analysis).

Despite the State's claims that Hedges's expert report generated by the Arkansas State Crime Laboratory as well as Hedges's expert testimony at trial were sufficient under governing precedent to identify the substances seized as oxycodone and hydrocodone, we disagree. The State submits that the identification of pills using the imprint code was Hedges's common practice and that Kellensworth ignores existing Arkansas precedent in arguing for the adoption of holdings from extrajurisdictional cases. The State cites several

4

cases as controlling precedent in support of its proposition that the evidence summarized above was sufficient to establish that the pills were oxycodone and hydrocodone. *See, e.g.*, *Robertson v. State*, 2018 Ark. App. 13, at 4–5, 6–7 (holding, in the course of a no-merit review pursuant to Ark. Sup. Ct. R. 4-3(k)(1) (2018), that the defendant's objection to identification of pills, limited to visual examination and confirmation of imprint code in drug database, provided no basis for appeal); *see also Armstrong v. State*, 5 Ark. App. 96, 97, 633 S.W.2d 51, 52 (1982) (holding that chemical analysis not required for identification by pharmacist of a controlled substance that he had dispensed). The State maintains that it is well established that even lay testimony and circumstantial evidence may be sufficient to identify a controlled substance without resorting to expert chemical analysis. *E.g.*, *Moser v. State*, 262 Ark. 329, 330, 557 S.W.2d 385, 385–86 (1977). Viewed in the light most favorable to the State, *e.g.*, *Barfield v. State*, 2019 Ark. App. 501, at 1–2, 588 S.W.3d 412, 413, the State argues there was sufficient evidence presented for the jury to determine that the pills seized were oxycodone and hydrocodone.

We disagree with the State's analysis and point out that all the cases the State cites in support of its contention that no chemical testing was required to uphold Kellensworth's convictions for possession of hydrocodone and oxycodone are distinguishable. First, *Robertson* is distinguishable because in that case, one of the pills at issue *was* chemically tested, with the remaining four pills being visually identified as the same substance. *Robertson*, 2018 Ark. App. 13, at 4–5. Here, no chemical testing was performed on any of the pills purported to contain oxycodone and/or hydrocodone. Likewise, *Armstrong* is distinguishable because the State secured the attendance and testimony of the prescribing physician who had dispensed the pills at issue. *Armstrong*, 5 Ark. App. at 97, 633 S.W.2d at 52. Finally, we note

5

that *Moser*, cited by the State, is distinguishable because the substance at issue in that case was not pills but rather marijuana. In *Moser*, lay witnesses testified that they smoked the alleged marijuana and found it to taste, smell, and have the effects similar to the marijuana they had smoked hundreds of times previously. *Moser*, 262 Ark. at 330, 557 S.W.2d at 335-36.

Hedges, who qualified as an expert without objection, received a degree in chemistry with a minor in biology. He has also received special training in chemistry and specific drug testing, and he receives annual training in the field of forensic chemistry. In this case, he testified regarding his performance of a variety of drug-analysis tests on various items seized during the search including a plastic bag containing a crystal substance and Ziploc baggies containing different substances. Yet with respect to the tablet he identified as an oxycodone tablet, Hedges testified that the tablet was so identified using the drugs.com data search. He explained that it is common practice for him to identify things visually, based on the logo. With respect to the hydrocodone pills, Hedges made no indication that any of those pills were tested, merely weighed.

His testimony was in support of the admitted crime-lab reports. Specifically, the crime-lab evidence-submission form (drugs and toxicology only) lists as evidence item number, E4—1 plastic baggie containing green vegetable matter and 1 pink pill, and E5—1 cigarette cellophane containing 5 white pills with a requested service of DA (drug analysis). The corresponding crime-lab report of laboratory analysis notes item "E4B"—with an evidence description of "one (1) pink round unscored tablet" and test result of "Net weight: 0.1585 (+/–0.0020) gram(s) *Identified as⋆ oxycodone (C-II)*," and item "E5"—with an evidence description of "five (5) white oblong unscored tablets" and test result of "Net

6

weight: 2.0877 (+/-0.0020) gram(s) *Identified as* hydrocodone, acetaminophen (C-II).*" The asterisk explanation at the bottom of the report states that "[t]he identification results were obtained by comparing the item's code imprint to imprint records and not by analytical testing. Any results confirmed by analytical testing are listed separately." Neither the evidence-submission form nor the laboratory report even listed the imprint codes from the tablets or the source against which they were compared.

Despite his qualification as an expert in forensic chemistry, Hedges's testimony was no more scientifically authoritative with respect to the confirmation of the pills' chemical makeup than that of a librarian reading a report. Similar to *Ward*, *supra*, it is Hedges's credentials as a forensic chemist that raise such concern when his testimony regarding the pills is based on an insufficient method of proof. The concern is that jurors may attribute so much authority to an expert in forensic chemistry that his or her testimony is treated as infallible and that jurors accordingly accept the expert's opinion on the chemical makeup of a substance—here the untested pills—without understanding that the "expert" chemist never performed a scientific, chemical analysis on the substance at issue.

For the foregoing reasons we conclude that, based on the identification of the pills as oxycodone and hydrocodone merely by means of a visual inspection and reference to the manufacturer's imprint code using a drug-identification database, the State failed to meet its burden of demonstrating that the pills are, in fact, the actual controlled substances charged. Accordingly, we reverse and dismiss Kellensworth's convictions on two counts of possession of a controlled Schedule I or II substance excluding methamphetamine and cocaine (one for hydrocodone, and one for oxycodone).

7

B. Sufficiency of the Search Warrant

In reviewing the denial of a motion to suppress evidence, this court conducts "a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the circuit court and proper deference to the circuit court's findings." *Johnson v. State*, 2018 Ark. App. 429, at 2, 559 S.W.3d 767, 769; *see Meeks v. State*, 2016 Ark. App. 9, at 3, 479 S.W.3d 559, 561. A circuit court's denial of a motion to suppress will be reversed only if it is against the preponderance of the evidence. *E.g.*, *Ritter v. State*, 2011 Ark. 427, at 7, 385 S.W.3d 740, 744; *Meeks*, *supra*.

The Fourth Amendment to the United States Constitution provides that no search warrants shall issue except those "particularly describing the place to be searched." *E.g.*, *Walley v. State*, 353 Ark. 586, 605, 112 S.W.3d 349, 360 (2003). An application for a search warrant shall describe with particularity the places to be searched and the things to be seized. *See* Ark. R. Crim. P. 13.1(b) (2019). Further, a warrant shall state, or describe with particularity, the location and designation of the places to be searched. *See* Ark. R. Crim. P. 13.2(b)(iii). The requirement of particularity of describing the location and place to be searched exists to avoid the risk of the wrong property being searched or seized. *Beshears v. State*, 320 Ark. 573, 898 S.W.2d 49 (1995).

The task of the judge issuing warrants "is simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Brenk v. State*, 311 Ark. 579, 588, 847 S.W.2d 1, 6 (1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)). Courts should not subject the description in a warrant to

8

hypercritical review. *Ritter*, 2011 Ark. 427, at 7, 385 S.W.3d at 744. Highly technical attacks are not favored because they may discourage law-enforcement officers from utilizing search warrants. *Id.*

Regarding the sufficiency of the description in an affidavit, it is "sufficient if it describes circumstances establishing reasonable cause to believe that things subject to seizure will be found in a particular place." Ark. R. Crim. P. 13.1(b). A description in a warrant is sufficient if it enables the executing officer to locate and identify the premises with reasonable effort and whether there is any likelihood that another place might be mistakenly searched. *E.g.*, *Ritter*, 2011 Ark. 427, at 7, 385 S.W.3d at 744; *Costner v. State*, 318 Ark. 806, 887 S.W.2d 533 (1994); *Perez v. State*, 249 Ark. 1111, 463 S.W.2d 394 (1971)).

Further, it does not matter whether law enforcement actually searched the "correct" residence but rather whether the location can be identified with particularity from the language used in describing it. *See Perez*, 249 Ark. at 1116, 463 S.W.3d at 396. "[I]t is not necessary that the affidavit be completely without inaccuracy as long as the inaccuracies are relatively minor when viewed in the context of the totality of the circumstances, including the affidavit taken as a whole and the weight of the testimony of the participants who procured and executed the search warrant." *Bragg v. State*, 2016 Ark. App. 378, at 5, 499 S.W.3d 261, 264.

An incorrect address, alone, does not require suppression if the affidavit contained other identifying facts, such as a description of the place to be searched, directions to the place, or names the person to whom the premises belongs. *E.g.*, *Jones v. State*, 45 Ark. App. 28, 35, 871 S.W.3d 403, 407 (1994). Moreover, when "the same officer both applie[s] for and execute[s] the warrant a mistaken search is unlikely." *Pike v. State*, 30 Ark. App. 107,

110–11, 783 S.W.2d 70, 72 (1990) (quoting *Lyons v. Robinson*, 783 F.2d 737, 738 (8th Cir. 1985)).

In the instant case, because officers listed at least three different numerical addresses for his trailer in various law-enforcement documents, Kellensworth argues that the description of the place to be searched in the search warrant and accompanying affidavit was inaccurate compared to the actual location of his residence.[1] He argued in his motion to suppress the evidence seized pursuant to a search warrant listing 354 Grant 52 as the place to be searched that the affidavit for the search warrant at issue was "insufficient as a matter of law and therefore was invalid."

We disagree and hold that under the circumstances, the search warrant described the place to be searched with sufficient particularity despite the inconsistencies in the numerical portion of the street address listed in the search warrant and the accompanying affidavit.

The testimony at the hearing on Kellensworth's motion to suppress included the description of an initial controlled drug buy on December 2, 2016, accomplished with the assistance of Brandy Smith, a confidential informant who knew Kellensworth personally. Smith testified that she, accompanied by another confidential informant, Melinda Grist, led the police to the mobile home where Kellensworth was selling drugs. Smith stated she did not know the name of the road, but she knew where Kellensworth lived and previously had been there.

---

[1]Kellensworth argues that the circuit court's decision was clearly erroneous because "neither the affidavit nor the warrant listed Kellensworth by name." He is incorrect because although the warrant itself does not list him by name, the affidavit clearly indicates that "the residence is being occupied by a W/M known and ID as a Bobby Kellensworth."

Smith positively identified a photograph of a mobile home, admitted at the hearing as State's exhibit 1, as the premises where she purchased drugs from Kellensworth on December 2, 2016, and "the place that he lived at the time." Grist also identified the same mobile home depicted in State's exhibit 1 as the location where the drugs were purchased from Kellensworth on December 2, 2016.

Agent Smith of the Group 6 Narcotics Enforcement testified at the suppression hearing that he was one of two police officers who arranged and observed the controlled drug buy on December 2. He and another officer, Agent Keathley, met with Smith and Grist that day, then followed Smith's vehicle to the location where Kellensworth was selling drugs. Agent Smith observed Smith go into the mobile home to complete the transaction. He also identified the photograph of a mobile home, State's exhibit 1, as the location where the drug buy occurred on December 2.

On December 8, another controlled buy was arranged. As before, Smith returned to the same mobile home depicted in State's exhibit 1 to complete a second drug transaction with Kellensworth. Agent Smith completed the affidavit for a search warrant including taking photographs of the mobile home where the two controlled drug buys had occurred and attaching them to the affidavit. Agent Smith explained that he did not know the numerical address of the mobile home where the warrant was served, but he repeatedly identified State's exhibit 1 as the location where he observed the December 2 drug buy and where he conducted the search.

Agent Smith acknowledged, on being shown a photograph of a piece of mail obtained from the premises during the search, that it depicted "386 Grant 52" as Kellensworth's numerical address. He noted that the address shown on a mailbox across the

11

street from the mobile home, which also was depicted in State's exhibit 1, was different from the address on the affidavit, the search warrant, and other law-enforcement documents. Agent Smith testified that he did not see a mailbox or the street address on the mobile home during the drug buys or prior to obtaining the search warrant. He testified that the address he used, "354 Grant 52," was gleaned from Kellensworth's driver's-license records.

Agent Keathley testified that he is the officer who met with Smith and observed the second drug buy. He followed Smith to the same mobile home as the December 2 buy. He testified that State's exhibit 1 depicted the same mobile home where the second drug buy occurred on December 8. Agent Keathley testified that he saw Smith enter the mobile home to complete the transaction. He explained that both controlled buys he had observed, as well as the search he later assisted Agent Smith in conducting, all occurred at the same mobile home.

Kellensworth testified at the suppression hearing, acknowledging that the mailbox depicted in State's exhibit 1 is his. That same photograph depicted the mobile home across the street from the mailbox, which the State's witnesses consistently identified as the mobile home where the controlled drug buys occurred and where the search warrant eventually was executed. Kellensworth noted that the address on his mailbox is 386 Grant 52 and stated that he had lived in the trailer at that location, across the street from the mailbox, for about ten years. He testified that the mailbox depicting his street address was in that same location, "across from my home when all of this happened in December of 2016."

Despite Kellensworth's reliance on *Perez*, *supra*, in which a search warrant was found to be "fatally defective" because it "gave no identification of the specific apartment except by the incorrect name of its occupant, who was not otherwise identified," we note that

12

even in *Perez*, our supreme court held that such specific information in the affidavit would cure any technical defect in the warrant itself. *See Perez*, 249 Ark. at 1117–18, 463 S.W.2d at 397 (deficiency in warrant may be cured by proper description in supporting affidavit); *see also Walley*, 353 Ark. at 607, 112 S.W.3d at 361 (holding, in part, that a correct address listed in affidavit mitigated "minor discrepancy" of incorrect address in warrant itself).

Kellensworth attempts to distinguish the holding in *Ritter* on the basis that police in that case kept the property to be searched under "constant surveillance" while the warrant was being obtained. While the matter of constant surveillance may be an additional factor mitigating a minor address discrepancy in a warrant, the officers' familiarity with the premises was at least equally important in *Ritter. E.g.*, *id.* at 8, 385 S.W.3d at 745 (holding that the likelihood of searching the wrong residence was "mitigated by the fact that the officers executing the warrant personally knew which premises were to be searched and the fact that the intended location was under surveillance while [an officer] secured the warrant"). His contention that constant surveillance is crucial in these cases is contradicted by other cases in which warrants have been upheld absent constant surveillance and based simply on the affiant being the same officer involved in the execution of the warrant. *See Walley*, 353 Ark. at 606–07, 112 S.W.3d at 361; *Costner*, 318 Ark. at 808–09, 887 S.W.2d at 534–35; *Wormley v. State*, 2010 Ark. App. 474, at 6, 375 S.W.3d 726, 731.

In sum, regardless of what Kellensworth claims his numerical street address to be, the record does not indicate that officers relied on that detail in obtaining and executing the search warrant. They focused primarily on the photos and their recollections of where the recent controlled drug buys took place. Under these circumstances, even though there was a minor discrepancy in the numerical street address noted in the affidavit and the warrant,

it did not invalidate the warrant or the resulting search. *See, e.g.*, *Ritter*, 2011 Ark 427, at 8, 385 S.W.3d at 745. Any discrepancy in the address was mitigated by the fact that Kellensworth was named in the accompanying affidavit and because photographs of the particular property to be searched were attached. *E.g.*, *Perez*, 249 Ark. at 1117–18, 463 S.W.2d at 397. Finally, there is no dispute that "the premises that were intended to be searched were, in fact, searched." *Ritter*, 2011 Ark. 427, at 9, 385 S.W.3d at 745. Accordingly, we hold that the circuit court did not clearly err in denying Kellensworth's motion to suppress the evidence seized as a result of the execution of the search warrant.

C. Preclusion of Kellensworth Adducing Evidence Regarding Law Enforcement's Inconsistencies in Determining the Physical Address of His Alleged Residence

Regarding the State's motion in limine to preclude the defense from presenting testimony or evidence related to Kellensworth's precise numerical address and/or mailbox information, the State argued that because the circuit court had already ruled that the search warrant was valid and that all evidence seized pursuant to it was admissible, any mention of Kellensworth's numerical address or his mailbox listing would confuse the jury. Kellensworth's counsel countered:

COUNSEL: It's part of the res gestae. We need to know who, what, when, and where, this is the where. If my client is not in proximity to the address of the actual location when they discovered contraband, it is relevant towards whether the state can establish constructive possession. The State is essentially saying we can't have a defense. I can't think of more relevant evidence, the location where these things were found.

COURT: The thing we're not going to do is talk about the confusion over the Box number, because that—I don't really see that as relevant today, I've ruled on that, and any—any testimony on that would be confusing and misleading to the jury.

The circuit court specified that Kellensworth's counsel was precluded from cross-examining the State's witnesses about the inconsistent physical addresses listed throughout their reports.

COURT: I don't see that leads to anything but confusion. I have ruled on that. Like I said, I'm not cutting you off to no defense, but if you're going to try to present a defense that the defendant was not actually—not living in the premises that were searched, because I'm sure—I anticipate or at least that's what's going to be the testimony of the state—if you're going to present a defense to that, I'm not going to rule that you can't use that. What we're not going to argue today is the box numbers and things such as that being wrong on that particular residence.

COUNSEL: When the [c]ourt denied my motion to suppress, it made the legal ruling that the warrant was supported by probable cause. It did not make the legal ruling that this home is a particular address, it did not make the legal ruling that Mr. Kellensworth lives at a particular address.

COURT: What I'm arguing is we're just not going to get into different box numbers. We've litigated that and—and I've ruled that the search warrant was proper of that address. Now you—if you're going to make your defense that he wasn't living at the place that was searched, that's totally up to you. I'm not cutting you off from that defense.

His counsel then proffered testimony from Kellensworth's grandmother, Diane Bogard, confirming Kellensworth's address was 386 Grant 52 and that the mailbox had been there for the three years prior. Counsel then proffered a photo of the mailbox listing the address as "386 Grant 52" and the resident as "B. Kellensworth." Kellensworth's counsel also proffered numerous police reports authored by different officers listing the address where the controlled buys occurred as 354 Grant 82.

At trial, Agent Keathley testified that the warrant was executed at 354 Grant 82. Another deputy, Joe Scott, testified that he believed the address officers executed the warrant at was 584 Grant 52. Another officer, Deputy Tim Preator, candidly testified that he did not know which address was associated with Kellensworth's trailer. Agent Keathley testified

15

that he did not know the exact address, and Agent Smith testified that he did not recall the address. In light of its pretrial ruling, the circuit court precluded counsel from questioning Agent Smith further about his lack of recall and from asking whether he had recorded the address in his reports. Kellensworth's counsel was precluded from impeaching these officers with their prior testimony and reports listing different numerical addresses.

Before closing arguments, counsel informed the circuit court that he intended to comment on the States' witnesses having testified to different physical addresses in his argument. The circuit court ruled it would be "confusing to the jury" and that there would be "[n]o reference to it in closing." The circuit court clarified in comments made in chambers:

> And this is what my ruling has been, I thought from the beginning—there was some miscommunication, just don't use that as impeachment or to—that is something that would confuse the jury as to whether that was actually the residence. You had sufficient evidence from the State, and you could have produced witnesses, if you were going to say this was not actually his residence. I have ruled that the numbers of the houses are confusing and not relevant.

Kellensworth argues that the circuit court manifestly abused its discretion by limiting his examination of witnesses and argument about alleged inconsistencies in numerical address and mailbox numbers. He divides his argument into several assertions that (1) his numerical street address was relevant to the charges against him; (2) his specific physical address was part of the res gestae of the case; (3) evidence of an address shown on the side of a mailbox was not so complex as to unduly confuse the jury; (4) the circuit court's ruling deprived him of his constitutional right to present a defense; and (5) the circuit court's ruling impermissibly shifted the burden of proof from the State having to prove his possession of the contraband to his having to disprove possession.

Kellensworth's argument does not go quite so far as to suggest that there was evidence to refute that he was present at the mobile home identified by the witnesses on the dates the controlled drug buys, the search, and the arrest occurred. Accordingly, substantively, what he was excluded from presenting at trial was an attempt to reargue his motion to suppress before the jury.

Kellensworth's first two subpoints can be addressed together, as they both relate to the relevance of his address proving an issue at trial. The decision to admit or to exclude evidence is within the sound discretion of the circuit court, and appellate courts will not reverse that decision absent a manifest abuse of discretion. *See, e.g.*, *Lowery v. State*, 2019 Ark. 332, at 7, 586 S.W.3d 644, 649; *Jackson v. State*, 2018 Ark. App. 222, at 4, 547 S.W.3d 753, 756. This evidentiary standard encompasses the scope of cross-examination. *Jackson*, *supra*. Moreover, the circuit court has wide latitude to impose reasonable limits on cross-examination based on concerns about the confusion of issues or interrogation that is only marginally relevant. *E.g.*, *id*. The abuse-of-discretion standard is a high threshold that requires more than a demonstration of a simple error in the court's decision; the circuit court, instead, must have acted improvidently, thoughtlessly, or without due consideration. *E.g.*, *Muhammad v. State*, 2019 Ark. App. 87, 572 S.W.3d 21. Even if an appellant demonstrates an abuse of discretion, there must also be a showing by the appellant that prejudice resulted. *E.g.*, *id*.

The exact street address where the search and arrest of Kellensworth occurred was, at best, only marginally relevant to establishing reasonable doubt as to Kellensworth's location during the controlled drug buys and his occupancy of the premises when and where the search warrant was executed, especially in the face of the rest of the State's proof of

17

those facts. And Kellensworth was permitted to cross-examine several witnesses at trial regarding their knowledge—or lack thereof—of the numerical address where the controlled drug buys and the search occurred.

Next, Kellensworth argues that the circuit court's exclusion of evidence of his correct numerical address because it carried an unfair danger of confusing the jury underestimates the competency of Arkansas juries. He cites numerous cases in which evidence has been excluded on this basis when it involves complex, unrelated information, *see, e.g.*, *Poff v. Elkins*, 2014 Ark. App. 663, 449 S.W.3d 315, contrasting those cases with the physical address of his residence painted on the side of a mailbox, which he maintains is not similarly complex yet is clearly related to the issue at hand.

The circuit court found, and we agree, that the actual address number was irrelevant to the State's clearly establishing at trial that Kellensworth was physically occupying the house where the controlled drug buys occurred and where the drugs subsequently were found. Kellensworth failed to establish—either before the circuit court or on appeal—that any alleged inconsistency in the numerical address of his residence was somehow material to the State's proof of the crimes charged.

Kellensworth's fourth subpoint is that the circuit court's ruling violated his constitutional right to present a defense. He argues that he intended to present a defense that "challenge[d] where the contraband at issue was actually located, specifically, that the contraband at issue in his trial was found inside a residence other than the one in which he resided." But his argument ignores the undisputed proof that the drugs and other contraband were found in the trailer that he was occupying—regardless of its physical, numerical address—at the time the search warrant was executed.

18

Although "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'" our supreme court has also recognized that "state and federal lawmakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Schnarr v. State*, 2017 Ark. 10, at 8 (internal citations omitted). Indeed, the Constitution permits judges to exclude evidence that is "repetitive . . ., only marginally relevant," or poses an undue risk of "confusion of the issues." *Id.* (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326–27 (2006)).

Finally, Kellensworth argues that the circuit court's exclusion of the evidence of his numerical address shifted the burden of proof to him to disprove his guilt because the circuit court noted that he "should have called a particular witness" in his defense. Specifically, he cites the statement by the circuit court that "you had sufficient evidence from the State, and you could have produced witnesses, if you were going to say this was not actually his residence." Kellensworth conveniently neglects to note that this statement was made outside the presence of the jury while the parties were discussing what would be allowed during closing arguments. The circuit court's actual comment in the context of the trial reveals that it was merely a summarization of its prior rulings that the only issue being excluded was questioning and testimony regarding alleged inconsistencies in mailbox numbers—Kellensworth had not been cut off from putting on a defense, including producing witnesses who might have testified that the location of the search and arrest "was not actually his residence." The circuit court's comment was made in direct response to Kellensworth's counsel's request—which was denied—to make closing argument as to the inconsistencies in the numerical street address, the very subject of the court's prior rulings.

A circuit court has broad discretion in controlling closing argument. *E.g.*, *Marbley v. State*, 2019 Ark. App. 583, at 9–10, 590 S.W.3d 793, 799. Kellensworth fails to establish how the comment in chambers impermissibly shifted the burden of proof to him in the eyes of the jury. Likewise, he fails even to allege that the ruling foreclosing argument as to issues ruled irrelevant and potentially confusing to the jury was an abuse of the circuit court's discretion.

Affirmed in part; reversed and dismissed in part.

WHITEAKER and BROWN, JJ., agree.

*Michael Kiel Kaiser* and *William O. "Bill" James, Jr.*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *David L. Eanes, Jr.*, Ass't Att'y Gen., for appellee.